IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No. 12-cv-00609-WYD-MJW

JILL COIT,

      Plaintiff,

v.

ARISTEDES ZAVARAS, [former] Director of the Colorado Department of Corrections,
JAMES WELTON, Director of C.I.D.,
LARRY REID, L.V.C.F.,
ROBERT CANTWELL,
LLOYD WAIDE, L.V.C.F.,
C.I.D. DENNIS HOUGNON,
C.I.D. COLIN CARSON, D.W.C.F., and
JOAN SHOEMAKER,

      Defendants.

---

**ORDER**

---

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on Defendant Carson, Hougnon, Reid, Cantwell, Waide, Zavaras, and Welton's Motion for Summary Judgment (ECF No. 449) and Defendant Shoemaker's Motion for Summary Judgment (ECF No. 448), filed April 15, 2015. Responses to the motions (ECF Nos. 455 and 456) were filed on July 29, 2015. On October 15, 2015 and October 30, 2015, the Defendants filed reply briefs in support of their motions (ECF Nos. 461 and 464).

This action arises out of Plaintiff's confinement with the Colorado Department of Corrections ("CDOC"). After numerous pretrial motions, recommendations by the magistrate judge, and orders of this Court, the following three claims remain at issue in

this case:  (1) Plaintiff's Eighth Amendment failure to protect claim, which accrued on or after March 9, 2010, asserted against Defendants Zavaras, Welton, Reid, Cantwell, Waide, Hougnon, and Carson; (2) Plaintiff's retaliation claims, which accrued on or after March 9, 2010, asserted against Defendants Zavaras, Welton, Reid, Waide, Cantwell, Hougnon, Carson, and Shoemaker; and (3) Plaintiff's Eighth Amendment denial of adequate medical care claim asserted against Defendant Shoemaker.

In the pending motions, the Defendants seek summary judgment on all of Plaintiff's remaining claims.  After carefully considering the pleadings and relevant record, I find that the motions should be granted as set forth below.

## II.   BACKGROUND / RELEVANT FACTS

I have carefully reviewed all of the parties' submissions.  For purposes of these motions only, I construe all facts in the light most favorable to Plaintiff.   Thus, the material facts are as follows.

In 1995, Plaintiff was sentenced to life in prison and remanded into the custody of the CDOC.  Prior to July 2009, Plaintiff was housed in the Denver Women's Correctional Facility in Denver, Colorado.  In July 2009, Plaintiff was transferred to the La Vista Correctional Facility in Pueblo, Colorado.  In July 2010, Plaintiff was transferred back to the Denver Women's Correctional Facility.  In August 2010, Plaintiff was transferred to the Kansas Department of Corrections.  In January 2011, Plaintiff was transferred to the Florida Department of Corrections.  In June 2015, Plaintiff was transferred back to the Denver Women's Correctional Facility.

<u>Defendants Welton, Carson and Hougnon</u>

Defendant Welton was formerly the Inspector General for the CDOC until his retirement in May 2013.  The Inspector General's Office performs the investigation and gathering of information related to prison crime and security threat group activities.  The Inspector General's Office employs a number of investigators who are assigned to investigate and gather information related to prison crime, staff misconduct, and security threat group activity.  While Defendant Welton did not personally perform investigations, he supervised and managed the investigators.

In 2009, Defendant Carson was an investigator who was assigned to the Denver Women's Correctional Facility.  In 2009, Plaintiff provided information that male staff members at the Denver Women's Correctional Facility were engaged in sexual misconduct with several female inmates at the facility.  In July 2009, Defendant Carson received a typed contract from Plaintiff that proposed that Plaintiff work for the CDOC providing information on sex abuse cases.  Plaintiff's proposed contract outlined her title, work responsibilities and compensation.  The contract further indicated that in return for providing information regarding sexual assaults on female inmates, Plaintiff would receive $5.00 per day in compensation as well as donations to be made to the charity of her choice.  Plaintiff's proposed contract was sent to the Inspector General's Office as well as Defendant Vasquez with the Denver Police Department.  Defendant Vasquez was leading the investigation into allegations of sexual assault on females at the Denver Women's Correctional Facility.

Defendant Carson characterized the Plaintiff as having a "large" or "visual" presence in the prison and would approach staff members on behalf of other inmates.

Plaintiff was regarded by other inmates as a "legal go-to person."  In mid-2009, Plaintiff complained to Defendant Carson that she was being retaliated against at the Denver Women's Correctional Facility for her advocacy on behalf of herself and other inmates. Defendant Carson ultimately found that there was no evidence to support these allegations.

In June or July 2009, Plaintiff informed Defendant Carson that a number of inmates at the Denver Women's Correctional Facility were being sexually assaulted by a staff member.  Defendant Carson conducted an investigation in cooperation with the Denver Police Department, which involved extensive interviews with the victims and ultimately DNA samples were obtained from that victim and the alleged assailant. Although Defendant Carson presented this case for prosecution to the District Attorney, the District Attorney's Office declined to prosecute due to discrepancies in the statements of the witnesses and Plaintiff.  The alleged assailant was removed from all women's prisons during the pendency of the criminal investigation, and subsequently resigned before a professional standards investigation could be taken against him.

In July 2009, Defendant Carson received a letter from Plaintiff stating that she was upset after being transported to the Denver Police Department to answer questions regarding the sexual assault allegations at the Denver Women's Correctional Facility. In the letter, Plaintiff stated that she wanted to broker a deal between CDOC and the victims who had alleged sexual assault.

In August 2009, Defendant Carson received another letter from Plaintiff.  At that time, Plaintiff had been transferred to the La Vista Correctional Facility, a separate prison in a different location from the Denver Women's Correctional Facility.  In her

letter Plaintiff thanked Defendant Carson for arranging for her transfer to La Vista Correctional Facility.

In October 2009, Defendant Welton received a letter from Plaintiff claiming that an unidentified woman at the La Vista Correctional Facility had been the victim of sexual assault by a prison staff member.  Plaintiff did not identify either the alleged victim or the alleged assailant in this letter.  Plaintiff indicated that she was acting on behalf of the alleged victim, and proposed a contract where Plaintiff and/or the victim might provide more information in exchange for a variety of demands including the victim being transferred to an out-of-state facility.  The proposed contract specified how the transport would be carried out, the type of food to be served, the type of restraints that could be used, the clothes that would be worn, and the staff members who would be present.  The proposed contract also required the CDOC to pay the costs of 60 minutes of telephone expenses per month, that CDOC pay for medical expenses, and that CDOC be liable for $500,000 for breaking the confidentiality sought by the victim.  Defendants did not respond with any offer to negotiate.

Defendant Hougnon, a Chief Investigator with the Inspector General's Office for the CDOC, was assigned to follow up with Plaintiff on these allegations.  Defendant Hougnon is the supervisor of Division I investigations, which primarily concerns criminal investigations.  Defendant Hougnon has approximately 39 years of experience in law enforcement and previously worked as a police office, beginning in 1974.  He has worked at the CDOC as an investigator since 1999.  Defendant Hougnon has had significant training and experience with the Prison Rape Elimination Act ("PREA") and investigating sexual assault crimes within the CDOC.

In 2009 and 2010, Defendant Hougnon met with Plaintiff numerous times to discuss her allegations.  Plaintiff repeatedly refused to disclose the names of the alleged victim or assailant to Defendant Hougnon.  Plaintiff told Defendant Hougnon that she would not disclose the identity of the victim because the victim wished to remain anonymous, and because the victim did not believe that the CDOC could adequately protect the victim.  Defendant Hougnon repeatedly told Plaintiff that if sexual assaults were occurring at La Vista Correctional Facility, the CDOC could and would protect the alleged victim, but Plaintiff refused to identify the victim unless the victim was transferred out of state.  Plaintiff also wanted to be transferred out of state because she believed she would be targeted by staff and other inmates for providing information to the Inspector General's Office.  However, Defendant Hougnon did not have the authority to transfer an inmate to an out of state prison.   Although Plaintiff questions the validity of alternative options, the CDOC used other methods (other than out of state transfers) to protect a victim from further sexual assaults, such as placing the victim temporarily in segregation for her protection, transferring the victim to another CDOC facility, separating the victim and the alleged assailant, and/or taking employment action against any staff member against whom substantiated allegations are made.

During this time period, Plaintiff also made a number of calls to a telephone hotline that the CDOC makes available to all inmates to report incidents of sexual assault.  Plaintiff left messages for Defendant Hougnon on this hotline, but Defendant Hougnon was not assigned to receive the telephone calls made on this hotline.

Defendant Hougnon spoke with other inmates and staff members at the La Vista Correctional Facility and tried to find evidence of any sexual assaults, but without the

identity of the alleged victim or assailant or other specific details, his ability to investigate was hampered.  No other offenders or staff members provided Defendant Hougnon with any information that would support Plaintiff's allegations.

Plaintiff never identified herself as the victim of any sexual assault.  In fact, Plaintiff twice admitted that she never disclosed that she was the alleged victim to Defendant Hougnon or to the Office of the Inspector General until after she was transferred out of the La Vista Correctional Facility in 2010.  Following Plaintiff's transfer out of La Vista Correctional Facility in 2010, Defendant Hougnon was no longer involved with any investigation regarding Plaintiff.

Defendant Welton was not present during the investigative meetings between Defendant Hougnon and Plaintiff, and he has no direct knowledge as to what information was shared.  While Plaintiff was housed at La Vista Correctional Facility, Defendant Welton did not receive any information from Defendant Hougnon that Plaintiff was herself the alleged victim of sexual assault, nor any information that Plaintiff was at risk.  Defendant Welton understood that Plaintiff's allegations were that she was claiming that another inmate was the victim of sexual assault and that Defendant Hougnon was conducting an appropriate investigation.

Defendant Carson does not work at the La Vista Correctional Facility.  Defendant Carson was not present during any meetings between Defendant Hougnon and Plaintiff. Defendant Carson testified that he was aware of Plaintiff's allegations that an inmate was being sexually assaulted by a staff member at La Vista Correctional Facility, but Plaintiff would not disclose the name of the alleged victim.  Shortly after Plaintiff was transferred out of the La Vista Correctional Facility back to the Denver Women's

Correctional Facility, on July 31, 2010, Defendant Carson received information via email from Captain Ramona Avant that Plaintiff recently attempted to send a letter to the U.S. District Court.  Defendant Carson was informed that Plaintiff alleged that the envelope contained a coffee filter with semen on it from a correctional officer who had been sexually assaulting her, presumably at Denver Women's Correctional Facility. Defendant Carson met with Plaintiff about the coffee filter.  Plaintiff told Defendant Carson about her allegations that several female inmates at La Vista Correctional Facility had been sexually assaulted by staff, to include an inmate who Plaintiff referred to as "328."  While Plaintiff did not tell Defendant Carson specifics about the coffee filter, Plaintiff did tell him that she would contact him with more information after she was transferred to a facility in Kansas.  However, Plaintiff never contacted Defendant Carson.

Meeting with Defendants Carson, Cantwell, and Welton

Prior to her August 2010 transfer to Kansas, Defendants Carson, Cantwell, and Welton met with Plaintiff at the Denver Women's Correctional Facility.  This meeting was held in the hopes that Plaintiff might be willing to provide more information about the allegations of sexual assault since Plaintiff was likely going to be transferred out of state.  Defendant Welton was not aware of the meeting or the reasons for it until shortly before it was held.  At the meeting, Plaintiff was repeatedly asked to provide details about the sexual assaults including the identity of the victim and the assailant so that the victim could be protected and the matter investigated.  Plaintiff refused to provide such information and again raised the issue of her proposed contract.  The meeting was

recorded, and despite the Plaintiff's requests that the recorder be turned off, the recorder remained on for the duration of the meeting.

At the meeting, Plaintiff stated that while she was incarcerated at the La Vista Correctional Facility, another female inmate told Plaintiff that she had been sexually assaulted.  Plaintiff identified this woman as "328" for her protection.  Plaintiff did not identify herself as the victim of sexual assaults, and despite pleas from the Defendants to identify the victim, Plaintiff refused.  Instead, Plaintiff requested that both she and "328" be transferred to the Alaska Department of Corrections.  In response, the CDOC indicated that it would attempt to obtain such a transfer pending an acceptance from the Alaska Department of Corrections.[1]  During the meeting, Plaintiff made remarks that indicated that she had been sexually assaulted.  This was the first time that Defendant Welton heard that Plaintiff was claiming that she was a victim of sexual assault by a CDOC staff member.  Plaintiff refused to name her assailant, but she indicated that the incident happened in 2009.  Plaintiff also continued to maintain that a different female inmate "328" had been sexually assaulted.  In the meantime, Plaintiff was housed in segregation at the Denver Women's Correctional Facility for her safety.  This was not intended to be a long term placement or punitive in any way, but only to secure Plaintiff's safety until other arrangements can be made.  On August 26, 2010, Plaintiff was transferred to the Kansas Department of Corrections.  After a short period of time, the Kansas Department of Corrections requested Plaintiff's removal, and on January 27, 2011, Plaintiff was transferred to the Florida Department of Corrections.

After Plaintiff was transferred out of the CDOC, she contacted the Inspector General's Office by letter and indicated that she had been the victim of sexual assault

---

[1] The Alaska Department of Corrections later rejected the CDOC's request to transfer Plaintiff.

while she had been incarcerated at the La Vista Correctional Facility.  Plaintiff named

the alleged assailant.  Even though Plaintiff had been transferred out of state, CDOC

Investigator Jay Kirby was assigned to continue to investigate Plaintiff's allegations.

Kirby travelled to Florida to interview the Plaintiff on March 29 and 30, 2011.  Kirby

subsequently determined that Plaintiff's allegations were unfounded.

Defendant Reid

Defendant Reid was employed as the Warden of the La Vista Correctional

Facility, the San Carlos Correctional Facility, and the Trinidad Correctional Facility, from

approximately 2007 through 2010, at which time he was promoted to Assistant Director

of Prisons.  A few months later, Defendant Reid was promoted to Deputy Director of

Prisons, which is his current position.

As the Warden of the La Vista Correctional Facility, Defendant Reid had general

supervisory authority over all inmates and staff at the facility.   There were additional

supervisory staff members responsible for more specific areas of prison operations,

such as the Associate Warden, the Custody and Control Manager, and others.  These

supervisors in turn supervised other supervisory level staff.  For instance, the Custody

and Control Manager supervised several Shift Commanders who held the rank of

Captain, and who had significant responsibility in running the day to day housing and

security operations at the facilities.  As Warden, Defendant Reid's duties did not involve

work in personally investigating allegations of criminal misconduct by staff.  These types

of investigations were performed by the Colorado Inspector General's Office.

Defendant Reid did not supervise the investigators who worked for the Inspector

General's Office.

When Defendant Reid was a Warden, it was his habit to walk the prison living units and yards to observe the activities at the facilities, and to occasionally speak with the inmates.  In the fall of 2009, Plaintiff approached Defendant Reid and informed him that someone other than herself was being sexually assaulted by a staff person at the La Vista Correctional Facility, and that she had information about the alleged assaults. In response, Defendant Reid called Plaintiff to his office to speak with Plaintiff about her allegations.  Plaintiff did not claim that she herself was the alleged victim; rather, she stated that she had information about another inmate.  If Plaintiff had come forward as the victim of sexual assault by a staff member, the safety protocol would have dictated that the Shift Commander would make arrangements to have the Plaintiff temporarily "Removed from Population" for her safety, and placed in the segregation unit, which was staffed by personnel from another facility.  As a result, the alleged victims are protected from any misconduct by La Vista Correctional Facility staff, and if necessary, the victim could thereafter be transferred to a new facility.

Since Plaintiff did not allege that she was the victim of sexual assault, Defendant Reid contacted the Inspector General's Office about Plaintiff's allegations.   An Investigator from the Inspector General's Office subsequently came to speak with Plaintiff about her allegations.  Consistent with his normal handling of investigations into allegations of professional misconduct and/or criminal activity, Defendant Reid did not take part in these conversations between Plaintiff and the investigator to allow for confidentiality.  It also prevents Defendant Reid or others from inadvertently behaving differently toward the staff person or persons under investigation, which could compromise the investigation by "tipping off" the individual to the fact of the

investigation, and alternatively, this preserves the individual's reputation and promotes the consistent treatment of an individual who may have been falsely accused of misconduct.  This approach also assists the investigator in building a rapport with any witnesses or victims of staff misconduct, as they are better assured of confidentiality. Additionally, the investigators have special training and experience in investigating criminal activity.  For these reasons, Defendant Reid did not involve himself in the investigation.

As a Warden, Defendant Reid did not have access to the PREA tips hotline, nor to any messages left on the tips hotline.   Defendant Reid was not personally involved in Plaintiff's transfer out of the La Vista Correctional Facility in July of 2010.

Defendant Zavaras

From 2007 through January of 2011, Defendant Zavaras was employed as the Executive Director of the CDOC.  The Executive Director is the highest supervisory position in the CDOC.  The Executive Director exercises supervisory and managerial authority over all CDOC offenders and staff.  During the time Defendant Zavaras was the Executive Director, the CDOC employed several thousand employees and supervised approximately 20,000 offenders.  As a result, the Executive Director delegates supervisory duties to individuals such as the Director of Prisons, Deputy Directors of Prisons, Assistant Directors of Prisons, prison Wardens, and to various other staff members of varying ranks, responsibilities, and authority.  Also, during this time, investigations into allegations of criminal misconduct by staff and certain kinds of professional conduct were tasks performed by the Inspector General's Office.

Defendant Zavaras was not aware that Plaintiff had alleged that she was the victim of sexual assault while she was incarcerated at the La Vista Correctional Facility in 2009 and 2010.  While Defendant Zavaras was generally aware that Plaintiff had made allegations regarding a sexual assault involving another inmate and that the Inspector General's Office was communicating with Plaintiff about this, Defendant Zavaras had no direct involvement in the investigation, and no other knowledge of allegations made by Plaintiff concerning this matter.  Defendant Zavaras has never met Plaintiff, nor has he ever spoken with her.

 Had Plaintiff reported that she was being sexually assaulted by a staff person, the CDOC's safety protocols would have dictated that the appropriate security staff would make arrangements to have the offender "Removed from Population" for her safety, and placed temporarily in the segregation unit.  The Inspector General's Office would be notified, and an Investigator would be assigned to conduct an investigation, or, if there was an ongoing investigation, the Investigator handling the matter would be notified.  Removal from Population is not intended to be a long term placement or punitive in any way, but only to secure an offender's safety until other arrangements can be made.  If necessary, the offender could thereafter be transferred to a new facility, or other arrangements could be made to keep the offender out of contact with the alleged assailant.  In addition, any staff members engaged in sexual misconduct with an offender would be subject to termination for professional misconduct, among other disciplinary actions.  The investigation could also be referred to the local district attorney's office for potential criminal charges.

All staff members were required to undergo training regarding the PREA, which is federal legislation that addresses sexual assault in prisons.  All staff members were also required to undergo training regarding the CDOC's zero tolerance toward sexual assault, regarding the appropriate ways to handle reports by offenders that they had been sexually assaulted, and regarding the appropriate way to provide assistance and medical care for offenders who reported having being sexually assaulted.  These trainings took place annually while Defendant Zavaras was the Executive Director.

Prior to 2009, there was an investigation at the La Vista Correctional Facility that revealed that a staff member had engaged in sexual misconduct with inmates.  This staff member was terminated from employment prior to 2009.  Other than this incident, in 2009 and 2010, Defendant Zavaras was not aware of widespread issues or problems with staff members and sexual misconduct at the La Vista Correctional Facility.  During his tenure as Executive Director, Defendant Zavaras stated that staffing levels at the La Vista Correctional Facility were never below the minimum adequate levels.

During the time period in question, there were only two security cameras in each cell house at the La Vista Correctional Facility.  Due to the placement of these cameras, Plaintiff's allegations of assault would not have been recorded by any camera.  The cameras would not have captured any recordings of inmates' cells, just the area in and around the control centers.

Defendant Waide

 From November 2009 through July 2013, Defendant Waide was employed at the La Vista Correctional Facility and San Carlos Correctional Facility.  Defendant Waide served as the Custody and Control Manager in which he oversaw Housing and Security

Operations at the facilities.   In this position, Defendant Waide supervised other supervisory level staff, including several Shift Commanders who held the rank of Captain, and who had significant responsibility in running the day to day housing and security operations at the facilities.  Defendant Waide's duties did not involve work in investigating allegations of criminal misconduct by staff.  As noted, these types of investigations were performed by the Colorado Inspector General's Office.  Defendant Waide was not aware that Plaintiff was alleging that she had personally been sexually assaulted while she was incarcerated at the La Vista Correctional Facility in 2009 and 2010.

While Plaintiff was housed at the La Vista Correctional Facility, Defendant Waide had a few conversations with Plaintiff about issues and concerns she had regarding property issues, religion practices, and medical appliances.  During these conversations, Plaintiff did not discuss sexual assault allegations with Defendant Waide.

At some point in time while Plaintiff was incarcerated at the La Vista Correctional Facility in 2009 and 2010, Defendant Waide learned that Plaintiff was speaking with an Investigator from the Inspector General's Office.  Defendant Waide did not take part in these conversations, and Defendant Waide only became aware of Plaintiff's allegations through investigators during the course of their investigation.  Plaintiff never informed Defendant Waide that she had been or was being sexually assaulted at the La Vista Correctional Facility, nor did anyone else inform him of these allegations.  Had Plaintiff reported that she was being sexually assaulted by a staff person, the safety protocol would have dictated that the Shift Commander would make arrangements to have Plaintiff removed from population for her safety, and placed in the segregation unit.

Defendant Waide would have been notified that Plaintiff had been segregated, but that would be the extent of his involvement.

Defendant Shoemaker

In 2009 and 2010, Defendant Shoemaker was employed as the Deputy Director of Prisons, Clinical Services, for the CDOC.  She retired from this position in June of 2013.  This position is a supervisory and managerial position, and Defendant Shoemaker's office was located at the CDOC headquarters in Colorado Springs, CO, and not at any of the CDOC's prisons.

In her position as the Deputy Director of Prisons, Clinical Services, Defendant Shoemaker was responsible for overseeing program development and implementation for the provision of medical care, mental health treatment, sex offender treatment, and substance abuse programs for the CDOC.  Defendant Shoemaker also supervised and managed other supervisory and management staff, who in turn had a more direct supervisory role over the medical care providers who actually saw patients and provided medical care.  Defendant Shoemaker did not provide medical care to offenders as a medical care provider.

In 2009 and 2010, the CDOC's offender population was approximately 20,000 offenders.  While the CDOC provides medical clinics within its prisons, offenders who need specialty medical care are referred to appropriate medical specialists in the community, outside the prisons.  At present, and in 2009 and 2010, the CDOC contracts with an entity known as Correctional Health Partners ("CHP"), and formerly Physician Health Partners ("PHP"), to manage the referral and approval of medical care by outside specialists.

CHP reviews requests by CDOC clinical staff for appointments with outside care specialists, and it also reviews requests for medical care devices and durable medical equipment.  Once CHP reviews a request, it provides a written response to the CDOC doctor making the request with the response.  If the decision is to deny the request, there is a process such that the doctor making the request can file an appeal of the decision.  Pursuant to CDOC policies, when an offender is seen by an outside specialist, the specialist is responsible for requesting approval for any additional appointments from CHP, just as a specialist might be responsible for submitting a claim for pre-approval for care to a health insurance company for a patient outside the prison environment.

As the Deputy Director of Prisons, Clinical Services, Defendant Shoemaker's duties are supervisory and managerial, and do not normally directly involve the provision of medical care.  Supervisory and managerial staff such as Defendant Shoemaker delegate medical care decisions regarding offenders to medical care providers.  Defendant Shoemaker, as the Deputy Director of Prisons, Clinical Services, does not have any direct involvement in the medical care given to offenders such as Plaintiff.  Further, it was not in the scope of Defendant Shoemaker's duties to review and approve or reject specialty medical appointments for offenders such as Plaintiff.

Defendant Shoemaker was not involved in Plaintiff's medical care.  Defendant Shoemaker had no knowledge of and played no role in the decisions by CHP or PHP to approve or disapprove requests for visits with outside specialists, or for other medical care or devices.  In 2009 and 2010, Defendant Shoemaker never countermanded

medical directives or orders by medical care providers concerning Plaintiff, or otherwise denied Plaintiff medical care or opportunities to see outside care specialists.

Defendant Shoemaker has had no contact with Plaintiff's medical care providers or prison staff members in the prison systems in other states. Defendant Shoemaker gave no instructions or orders that prison staff or medical care providers in other states deny Plaintiff any medical care or medical devices.

Facts and Opinions Regarding Plaintiff's Medical Treatment

Dr. Paula Frantz was the former Chief Medical Officer of the CDOC. Dr. Frantz reviewed Plaintiff's entire CDOC medical file and records from other care providers who evaluated and/or treated Plaintiff while she was incarcerated in the CDOC. In sum, Dr. Frantz found that Plaintiff has well documented degenerative arthritis of the lumbar spine, cervical spine, knees, wrists, left hip, and shoulders. Plaintiff has been evaluated by orthopedic surgeons numerous times and Plaintiff has refused left knee arthroscopy. Despite Dr. Frantz's opinion that it was not medically necessary, Plaintiff was allowed to keep a wheelchair in CDOC.

III.   STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Equal Emp't Opportunity Comm. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). "When applying this standard, [the Court must] view the

evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation marks and citation omitted). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

IV.   DEFENDANT CARSON, HOUGNON, REID, WAIDE, CANTWELL, WELTON AND ZAVARAS' MOTION FOR SUMMARY JUDGMENT

A.   Eighth Amendment Failure to Protect Claim

Defendants Zavaras, Welton, Reid, Cantwell, Waide, Hougnon, and Carson move for summary judgment on Plaintiff's failure to protect claim under three theories: (1) Plaintiff has not presented sufficient evidence for a *prima facie* case; (2) Plaintiff has not demonstrated personal participation by Defendants Zavaras, Waide, Cantwell, Carson, Reid, and Welton, and (3) they are entitled to qualified immunity.

I first turn to Defendants Zavaras, Waide, Cantwell, Carson, Reid, and Welton's argument with respect to personal participation.  The Eighth Amendment protects prisoners against cruel and unusual punishment, a right interpreted to impose a duty on prison officials to protect prisoners in custody from violence. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1976-77 (1994).  However, in order to successfully assert a § 1983 claim under the Eighth Amendment for failure to protect, a plaintiff must show personal involvement or participation in the incident.  *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996).  Supervisor status alone is insufficient to support liability. *Id.*  A supervisor is not liable under § 1983 for the actions of a subordinate unless an "affirmative link" exists between the constitutional deprivation and either the supervisor's

personal participation or his failure to supervise. *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008), *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993).

Here, Defendants Zavaras, Welton, Waide, Cantwell, Carson, and Reid argue that they were neither responsible for, nor even involved in, conducting the investigation into Plaintiff's allegations.  Defendant Carson was not assigned to investigate cases at the La Vista Correctional Facility, and only became involved in the investigation after Plaintiff had been transferred to another facility.  Defendants Zavaras, Reid, and Waide were not involved in Defendant Hougnon's investigation as it was outside the scope of their job duties.  Such investigations were assigned to the Inspector General's Office.

In this case, the Inspector General's Office assigned an investigator (Defendant Hougnon), with special training and experience, to investigate Plaintiff's allegations. Defendant Welton was a supervisory officer who assigned investigators to certain cases.  He delegated the investigation into Plaintiff's allegations to Defendant Hougnon, an experienced Chief Investigator.  Defendant Welton was not directly involved in the investigation, and there is no evidence to suggest that he received any information that Defendant Hougnon was not adequately investigating or protecting Plaintiff.  Similarly, there is no evidence to suggest that Defendant Cantwell had any involvement in the investigation other than a meeting prior to Plaintiff's transfer to the Kansas Department of Corrections.

I find that the record fails to show any personal participation or involvement by Zavaras, Reid, Cantwell, Waide, Carson, or Welton in failing to protect Plaintiff from her allegations of sexual assault at the hands of a CDOC staff member.  Defendant Zavaras is the Executive Director of CDOC and is responsible for the policies and administration

of that agency.  Defendants Reid, Cantwell, and Waide are supervisory CDOC officials, and they are not involved in the investigative duties into sexual assault allegations made by inmates against staff members.  These investigations are assigned to the Inspector General's Office.  Defendant Welton is a high-level supervisor at the Inspector General's Office in charge of assigning investigators to certain cases.  While Plaintiff may have spoken with some of these Defendants during the course of their day-to-day job duties, there is no evidence that any of these Defendants had actual knowledge that their subordinates ignored or did little to protect the Plaintiff from sexual assaults by staff members.  There is no evidence that these Defendants had a reason to believe that Plaintiff was in danger or that Defendant Hougnon was not properly investigating the matter.  Moreover, even if I were to assume that these Defendants had knowledge about Plaintiff's allegations of sexual assault, I find that they were not personally involved in failing to protect Plaintiff.

As to Defendant Carson, since no evidence has been presented to show that he was personally involved in the investigation into Plaintiff's allegations at La Vista Correctional Facility or that he failed to protect Plaintiff, I cannot find a sufficient showing of personal participation.  Consequently, the motion for summary judgment is granted to the extent that Defendants Zavaras, Welton, Reid, Cantwell, Waide, and Carson are entitled to summary judgment in their favor on Plaintiff's failure to protect claim.

The remaining defendant is Defendant Hougnon, who apparently concedes his personal participation in the alleged constitutional violation as he did not move for summary judgment on this ground.  I note that the record reveals that Defendant Hougnon was the Chief Investigator assigned to investigate Plaintiff's allegations of

sexual assault.  A reasonable inference from these facts is that Defendant Hougnon had some degree of control over Plaintiff's safety and keeping her away from her alleged assailant.

Defendant Hougnon asserts the defense of qualified immunity, thus, I set forth doctrine's relevant standards.  "In civil rights actions seeking damages from governmental officials, those officials may raise the affirmative defense of qualified immunity, which protects all but the plainly incompetent or those who knowingly violate the law."  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) (internal quotations and citation omitted).  Once the affirmative defense is raised by a defendant, the burden shifts to the plaintiff to come forward with facts or allegations sufficient to show both "that the defendant's actions violated a constitutional or statutory right" and that the right "was clearly established at the time of the defendant's unlawful conduct."  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal quotations and citation omitted); *see also Workman v. Jordan*, 32 F.3d 475, 479 (10th Cir. 1994); *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996).

Thus, in the context of a motion for summary judgment, I must consider whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [officials'] conduct violated a constitutional right?"  *Holland*, 268 F.3d at 1185. If I determine that there has been a violation of a constitutional right, then I must "ask whether the right was clearly established at the time of the defendant[s'] unlawful conduct."  *Id.* at 1186 (internal quotations and citation omitted).  If the plaintiff successfully establishes the violation of a clearly established right, the burden then shifts to the defendant, who must prove that there are no genuine issues of material fact

and that the defendant is entitled to judgment as a matter of law.  *Medina*, 252 F.3d at 1128; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.  Accordingly, I first address whether Plaintiff has shown that Defendant Hougnon's actions deprived her of a constitutional right.

Consistent with all Eighth Amendment claims, including a failure to protect claim, the Plaintiff must show both an objective component (that she is incarcerated under conditions posing a substantial risk of serious harm) and a subjective component (that the prison official acted with deliberate indifference to the prisoner's safety).  The subjective component requires that a prison official be aware of facts from which it can be concluded that a substantial risk of harm exists and that the official drew such an inference.  Mere negligence is not sufficient to establish deliberate indifference.  Instead, the standard requires recklessness or disregarding a risk of which the official was aware.  *Farmer*, 511 U.S.at 828-33 (1994); *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001); *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998).

Plaintiff argues that Defendant Hougnon should have been aware that she was being sexually assaulted by prison staff at La Vista Correctional Facility.  However, the record does not support this assertion.  Plaintiff repeatedly refused to identify either the victim of the alleged sexual assault or the assailant.  Defendant Hougnon implored the Plaintiff, on multiple occasions during his investigation, to identify the victim (which

Plaintiff stated was another female inmate), so Defendant Hougnon could immediately provide her protection.  While I find Plaintiff's allegations of sexual assault credible, I cannot find that this record satisfies the subjective standard of an Eighth Amendment claim.  There is simply no evidence that Defendant Hougnon knew that Plaintiff was at a substantial risk of harm.  Based on Plaintiff's own repeated statements, she was not the victim but was speaking out in on behalf of another inmate.  Also, it is clear that Defendant Hougnon took Plaintiff's allegations seriously, and based on his training and experience, conducted a thorough investigation.  He was hampered by the fact that Plaintiff would not identify the victim or the assailant, and no other inmate or staff member would come forward.  Even if it was determined that Defendant Hougnon should have done more in the course of his investigation or that his conclusions were erroneous or negligent, I find that his conduct does not rise to the level of an Eighth Amendment violation based on deliberate indifference.  "[P]rison officials who lacked knowledge of a risk cannot be said to have inflicted punishment."  *Farmer*, 511 U.S. at 844.  Since Plaintiff has failed to establish the subjective component of her Eighth Amendment failure to protect claim, she cannot show that Defendant Hougnon's actions violated a federal constitutional right.  Thus, Defendant Hougnon is entitled to qualified immunity.

      B.    <u>Retaliation Claim</u>

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of [her]" constitutional rights.  *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990).  Accordingly, a plaintiff "must prove that 'but for' the retaliatory motive, the incidents to which [s]he refers, including the disciplinary action, would not have

taken place." *Id.* at 949–50.  An inmate claiming retaliation must "allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir.1990).

Plaintiff has alleged that some or all of the Defendants retaliated against her for reporting instances of sexual assault.  Plaintiff claims that she was placed in administrative segregation and that her personal property was confiscated in retaliation for her speaking out about instances of sexual assault at the La Vista Correctional Facility.  While Plaintiff argues that other reasonable options existed to protect her from the sexual assaults apart from segregation, I note that in *Lobozzo v. Colo. Dept. of Corr. et al.*, 429 Fed. Appx. 707, 713 (10th Cir. 2011), the Tenth Circuit recognized the need for a female inmate to be placed in segregation for her safety following reports of sexual victimization by a staff member.  Additionally, in this case, the record reflects that Plaintiff was temporarily placed in segregation for her safety pending a transfer out of state, and not for any punitive or retaliatory purpose.  "Inmates have no constitutional right to placement in a particular prison facility." *Brigden v. State ex rel. Okla. Dept. of Corr.*, 129 F.3d 130 n. 5 (10th Cir. 1997).  "[T]he transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Id.*  Here, there was no disciplinary action.  Plaintiff was placed in protective custody for her protection.  I find there is no evidence in the record to show that Defendants Zavaras, Welton, Reid, Cantwell, Waide, Hougnon, and Carson retaliated against Plaintiff for making allegations of sexual assault.  Defendant Zavaras, Welton, Reid, Cantwell, Waide,

Hougnon, and Carson's motion for summary judgment as to Plaintiff's retaliation claim is granted.[2]

V.     DEFENDANT SHOEMAKER'S MOTION FOR SUMMARY JUDGMENT

   A.     Eighth Amendment Denial of Adequate Medical Care Claim

The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. Amend. VIII. The Eighth Amendment's prohibition against cruel and unusual punishment encompasses deliberate indifference by prison officials. *Howard v. Waide*, 534 F.3d 1227, 1235 (10th Cir. 2008) (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05 (internal citation omitted).

The elementary principles of dignity, civility, humanity, and decency "establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his or her medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of

---

[2] Defendants also move for summary judgment with regard to Plaintiff's claims for injunctive relief on the grounds that Plaintiff seeks improper injunctive relief and that her claims are moot due to her transfer out of the La Vista Correctional facility. Plaintiff does not respond to this argument, and after my careful review of the record, I agree with Defendants that Plaintiff's claims for injunctive relief are moot.

most immediate concern to the drafters of the [Eighth] Amendment.  In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* at 103 (internal quotation and citation omitted).

An Eighth Amendment claim for deliberate indifference involves "a two-pronged inquiry, comprised of an objective component and a subjective component." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).  With respect to the objective component, a medical need is serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (internal quotation and citation omitted).  The question is not limited to whether the inmate's symptoms render a medical need sufficiently serious, but also extends to whether the potential harm to the inmate is sufficiently serious.  *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005).

Under the subjective component, the defendant must have a "sufficiently culpable state of mind." *Farmer*, 511 U.S.at 834; *see also Self*, 439 F.3d at 1230–31. In other words, the plaintiff must establish that the defendant "knew [s]he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (internal citation and quotation omitted).

Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference.  *Mata*, 427 F.3d at 753. With regard to the subjective component, the question for consideration by the Court is:

"were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (quoting *Mata*, 427 F.3d at 753).  "A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition.  Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755; *see also Dougherty v. Kansas*, No. 08–3066, 2008 WL 2906505, at *3 (D. Kan. July 24, 2008) ("a delay in providing medical care does not violate the Eighth Amendment unless the plaintiff has suffered 'substantial harm' from the delay"; lifelong handicap, permanent loss, or considerable pain amounts).  "[P]rison officials who 'actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.'" *Howard*, 534 F.3d at 1239 (quoting *Farmer*, 511 U.S. at 844–45).  "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly or recklessly declined to act." *Howard*, 534 F.3d at 1239–40 (internal citation and modification omitted).

Here, Plaintiff asserts this claim against Defendant Shoemaker.  During the relevant time period, it is undisputed that Defendant Shoemaker was the Deputy Director of Prisons, Clinical Services for the CDOC.

The Tenth Circuit has long held that a government official cannot be liable under a theory of respondeat superior.  *Gagan v. Norton*, 35 F.3d 1473, 1476 n. 4 (10th Cir. 1994).  However, in a decision interpreting *Iqbal*, the Tenth Circuit noted that the Supreme Court narrowed the scope of supervisory liability under § 1983.  *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).  Thus, after *Iqbal*, the *Dodds* Court

instructed that a supervisor can be held liable under § 1983 only if "(1) [he] promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* at 1199.

In order for Plaintiff to establish an Eighth Amendment claim against Defendant Shoemaker, she must show an "affirmative link between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." *Serna v. Colo. Dept. of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). Under § 1983, a plaintiff may impose liability upon a defendant supervisor "who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution . . . ." *Dodds*, 614 F.3d at 1198 (internal quotations omitted).

Here, Plaintiff alleges that Defendant Shoemaker "restricted and obstructed her ability to consult with medical specialist[s] capable of diagnosing and treating her serious ongoing medical need[s] after being prescribed/recommended by facility physicians[s]." (Resp. at 16).

After carefully reviewing the proffered evidence, while I do find a genuine issue of facts exists as to whether Plaintiff suffers from a serious medical need (the objective element), I find that Plaintiff failed to offer any evidence to create a genuine issue of material fact to establish the subjective element and required level of personal

participation on the part of Defendant Shoemaker.  Nothing in the record indicates deliberate indifference by this Defendant.  Plaintiff's disagreements with her medical care are insufficient to show an affirmative link between the alleged constitutional violation and/or Defendant Shoemaker's personal participation.  While Plaintiff argues that Defendant Shoemaker "had institutional and supervisory responsibility to assure that the tasks delegated to those directly providing medical care and approving or disapproving requests for visits with outside specialists were properly and competently performing those tasks," (Resp. at 4), the evidence fails to support this argument.  In fact, the record reveals that Defendant Shoemaker was not a medical provider. Defendant Shoemaker had no personal involvement in or awareness of the medical care provided to Plaintiff.  Defendant Shoemaker never personally denied or countermanded any orders for medical care or disability accommodations while Plaintiff was incarcerated in the CDOC.  Defendant Shoemaker had no contact with Plaintiff's medical care providers or prison staff members in the prison systems in other states. Defendant Shoemaker gave no instructions or orders that prison staff or medical care providers in other states deny Plaintiff any medical care or medical devices.

Accordingly, because Plaintiff failed to create a genuine issue of material fact as to the subjective component of the Eighth Amendment violation, Plaintiff's claim fails. Defendant Shoemaker is entitled to qualified immunity.  Summary judgment is properly entered in favor of Defendant Shoemaker on Plaintiff's Eighth Amendment claim asserted against her.

B.     Retaliation Claim

Similar to the retaliation claim asserted against Defendants Zavaras, Welton, Reid, Cantwell, Waide, Hougnon, and Carson, Plaintiff alleges that Defendant Shoemaker denied her medical care in retaliation for Plaintiff reporting instances of sexual assault.  As I previously set forth in this order, it is unlawful for prison officials to retaliate against or harass an inmate because of the inmate's exercise of constitutional rights.  *Maschner*, 899 F.2d at 947.  Accordingly, Plaintiff must show that but for her allegations of sexual assault, Defendant Shoemaker would not have denied her medical care.  *Id.* at 949–50.  I find that Plaintiff has failed to provide any evidence that Defendant Shoemaker was even aware of Plaintiff's sexual assault allegations. Furthermore, the record shows that Defendant Shoemaker had no personal involvement in Plaintiff's medical care, thus, Plaintiff cannot show a retaliatory motive or action on the part of Defendant Shoemaker.  Summary judgment is granted in favor of Defendant Shoemaker as to this claim.[3]

VI.    CONCLUSION

Based on the foregoing, it is

ORDERED that Defendant Carson, Hougnon, Reid, Cantwell, Waide, Zavaras, and Welton's Motion for Summary Judgment (ECF No. 449) and Defendant Shoemaker's Motion for Summary Judgment (ECF No. 448) are **GRANTED.**  Summary Judgment is entered in favor of the Defendants with respect to Plaintiff's Eighth Amendment claims and retaliation claims.  The Clerk of the Court shall close this case.

---

[3] In her response, Plaintiff concurs with Defendant Shoemaker that injunctive relief would not be appropriate as presently styled, this I decline to address the issue in this order other than to grant Defendant Shoemaker's motion for summary judgment in its entirety.  (Resp. at 2-3 n. 2).

Dated:  March 29, 2016

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge